UNITED STATES of America, Plaintiff,

v.

DICO, INCORPORATED, Defendant.

No. Civ. 4–95–10289.

United States District Court,
S.D. Iowa,
Central Division.

June 30, 1999.

Gary L. Hayward, Asst. U.S. Atty., United States Attorney, Des Moines, IA, Fataima Z. Ahmad, Washington, DC, Sean Carman, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, Lois Schif-

fer, Michael N. Romita, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for plaintiff.

William J. Koehn, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, David Gass, Miller Johnson Snell & Cumminskey, Grand Rapids, MI, Stanley A. Reigel, Morrison Hecker Curtis Kuder & Parrish, Kansas City, MO, for defendant.

## ORDER

LONGSTAFF, District Judge.

The Court has before it Dico, Incorporated's ("Dico") January 19, 1999 motion to amend the Court's November 24, 1998, order setting forth issues for trial. The United States resisted the motion on February 5, 1999.

Also on February 5, 1999, the United States filed a motion to strike defendant's sixth and seventh affirmative defenses. Dico resisted this motion on February 19, 1999, and filed a motion for judgment on the pleadings on the same day. In a combined memorandum filed February 26, 1999, the United States resisted Dico's motion for judgment on the pleadings and replied to its motion to strike.

On April 19, 1999, the United States filed a notice of supplemental authority in support of its motion to strike and in opposition to Dico's motion for judgment on the pleadings. The motions are now considered fully submitted.

## I. BACKGROUND

On November 24, 1998, based on pleadings submitted by both parties, this Court entered an order defining the issues remaining for trial. Subsequently, on January 19, 1999, with permission from Magistrate Judge Ross A. Walters, Dico submitted a document entitled "First Amended Answer and Affirmative Defenses of Dico, Incorporated" ("Amended Answer"), which raises the following affirmative defenses not reflected in the Court's November 24, 1998 Order:

**1.** The Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERC-

*Sixth Affirmative Defense*

Plaintiffs' claims seek to effect an unconstitutional taking of private property, and are barred by the Fifth Amendment to the United States Constitution. U.S. Const. Amend. V.

*Seventh Affirmative Defense*

Plaintiffs' claims seek to deprive the Defendant Dico Incorporated of property without due process of law, and are barred by the Fifth Amendment to the United States Constitution. U.S. Const. Amend. V.

Amended Answer, at 6. In a motion filed the same day as its Amended Answer, Dico also seeks to amend this Court's stated issues for trial to include issues framed from the above defenses.

Dico's sixth and seventh affirmative defenses stem from the United States Supreme Court's decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). In *Eastern Enterprises*, a plurality of the Court held that a portion of the 1992 Coal Industry Retiree Health Benefit Act ("Coal Act"), 26 U.S.C. §§ 9701–9722, that required current and former coal mine operators to pay for health benefits for retired miners and their dependents, was unconstitutional as applied to Eastern, a former mine operator. Dico contends that, based on *Eastern Enterprises*, the United States' attempt to retroactively impose CERCLA[1] liability upon it amounts to an unconstitutional taking, and violates its due process rights under the Fifth Amendment to the United States Constitution. The United States disputes that *Eastern Enterprises* applies to the present CERCLA litigation, however. According to the United States, the Eighth Circuit's previous decision rejecting Fifth Amendment challenges to retroactive CERCLA application remains binding law. *See United States v. Northeastern Pharm. & Chem. Co., Inc. ("NEPACCO")*, 810 F.2d 726 (8th Cir.1986).

LA"), 42 U.S.C. § 9601 *et seq.*

### A. *United States v. NEPACCO*

Before deciding whether *Eastern Enterprises* or *NEPACCO* governs the present litigation, it is necessary to outline the relevant law and facts from both cases. *NEPACCO* stemmed from the defendant's 1971 disposal of hazardous waste on a Missouri farm. *NEPACCO*, 810 F.2d at 730. The Environmental Protection Agency ("EPA") learned of the disposal through an anonymous tip in 1979, and prepared a plan for cleanup of the waste shortly thereafter. *Id.*

In August 1980, the United States filed a complaint against NEPACCO, the manufacturer of the hazardous substances, and others pursuant to § 7003 of the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, 42 U.S.C. § 6973(a). The United States amended its complaint in 1982, adding counts for relief pursuant to CERCLA, which had been enacted after the United States filed its initial complaint. *Id.*

The district court applied CERCLA retroactively, and found NEPACCO and others jointly and severally liable under 42 U.S.C. § 9607(a). *Id.* at 731–32. On appeal, the Eighth Circuit affirmed the retroactive application of CERCLA, expressly rejecting the appellants' due process and takings clause arguments. *Id.* at 732. The court noted initially that "the statutory scheme itself is overwhelmingly remedial and retroactive.... [and that] [i]n order to be effective, CERCLA must reach past conduct." *Id.* at 733.

The *NEPACCO* court first addressed the appellants' due process argument, adopting the test set forth by the United States Supreme Court in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976):

> "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. [L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the

effect of the legislation is to impose a new duty or liability based on past acts."

*NEPACCO*, 810 F.2d at 733 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. at 15, 96 S.Ct. 2882). As further clarified by the Supreme Court in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, and quoted by the *NEPACCO* court: "Due Process is satisfied 'simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.'" *Id.* (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)). The *NEPACCO* court then applied this test and found that the cleanup of hazardous waste is a "legitimate legislative purpose," and that Congress acted rationally in "imposing liability for the cost of cleaning up such sites upon those parties who created and profited from the sites and upon the chemical industry as a whole." *Id.* at 734.

The *NEPACCO* court also rejected the appellants' taking argument, finding that the cleanup did not deprive a property owner of a property interest. Rather, "the government's cleanup of the site abated an 'imminent and substantial endangerment' to the public health and the environment, thus eliminating a public nuisance and restoring value to the property by removing the hazardous substances." *Id.* (citation omitted).

Since *NEPACCO*, one circuit court and several district courts have rejected similar constitutional challenges to the retroactive application of CERCLA. *See United States v. Monsanto Co.*, 858 F.2d 160, 173–74 (4th Cir.1988) ("The reasoning of *Turner Elkhorn* applies with great force to the retroactivity contentions advanced here.... [W]e agree with the Eighth Circuit that retroactive application of CERCLA does not violate due process."); *Kelley v. Thomas Solvent Co.*, 714 F.Supp. 1439, 1443–45 (W.D.Mich.1989) (court struck defendant's due process and taking defenses); *United States v. Iron Mountain Mines, Inc.*, 812 F.Supp. 1528, 1544–46 (E.D.Cal.1992) (same); *United States v. Hooker Chem. & Plastics Corp.*, 680 F.Supp. 546, 556–57 (W.D.N.Y.1988) (rejected due process and taking arguments); *United States v. Kramer*, 757 F.Supp. 397, 428–33

(D.N.J.1991) (struck defendant's constitutional arguments challenging retroactive application of CERCLA).

## B. *Eastern Enterprises*

The Supreme Court recently revisited the issue of retroactive statutory application in *Eastern Enterprises.* As discussed above, this case was filed by a former coal mine operator to challenge the retroactive application of a portion of the Coal Act that required it to pay for health benefits for retired mine workers and their dependents. *Eastern Enterprises v. Apfel*, 524 U.S. at 503, 118 S.Ct. at 2137.

Between 1947 and 1964, when it ceased mining operations, Eastern served as a signatory in a series of agreements between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators' Association ("BCOA"), a multiemployer group of coal producers. These agreements, referred to as the National Bituminous Coal Wage Agreements ("NBCWA"), set forth employment conditions, and ensured that miners would receive health and pension benefits from their individual employers. *Id.*, at 505–15, 118 S.Ct. at 2138–43. In 1950, a new NBCWA established a multiemployer welfare and retirement fund financed by a per ton royalty on coal produced by signatory coal producers. *Id.*, at 505, 118 S.Ct. at 2138. The format for this fund remained in place over the next two decades. *Id.*, at 507, 118 S.Ct. at 2139.

The fund was restructured in 1974, due in part to the passage of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, which implemented certain funding and vesting requirements for employee welfare benefit plans. To comply with ERISA, the 1974 NBCWA created four separate multiemployer plans, two covering pension benefits, and two covering other benefits, such as medical care. *Id.*, at 507, 118 S.Ct. at 2139. The 1974 NBCWA was the first agreement to expressly address medical benefits for retirees. *Id.*, at 507, 118 S.Ct. at 2139.

Subsequently, in 1978, a new NBCWA was signed which guaranteed that "orphaned" miners, those whose employers had either left the industry or the UMWA, would receive health care. As explained by the Court in *Eastern Enterprises*:

> To ensure the Plans' solvency, the 1978 NBCWA included a "guarantee" clause obligating signatories to make sufficient contributions to maintain benefits during that agreement, and "evergreen" clauses were incorporated into the Plans so that signatories would be required to contribute as long as they remained in the coal business, regardless whether they signed a subsequent agreement.

*Id.*, at 510, 118 S.Ct. at 2140.

The coal industry's economic problems continued, however, due in part to the increasing cost of health care. As a result, more producers left the industry, and the number of orphaned miners increased. Following a lengthy strike in 1989 and 1990 against the Pittston Coal Company for refusing to sign the 1988 NBCWA, Secretary of Labor Elizabeth Dole created an advisory commission to ensure the industry could continue to maintain the benefit plans. *Id.*, at 510, 118 S.Ct. at 2140. This commission, known as the Coal Commission, issued its report in 1990. Congress responded by passing the Coal Act in 1992. *Id.*, at 509–13, 118 S.Ct. at 2140–41.

One provision of the Coal Act set out " 'to identify persons most responsible for [1950 and 1974 Benefit Plan] liabilities in order to stabilize plan funding and allow for the provision of health care benefits to … retirees.' " *Id.* at 514, 118 S.Ct. at 2141–42 (quoting § 19142(a)(2) of the Coal Act). Section 9706 of the Act directs the Social Security Commissioner ("the Commissioner") to assign every eligible beneficiary to a "signatory operator" still in business. Pursuant to this section, the Commissioner must look first to the signatory operator that most recently employed the retired miner for at least two years, and signed a 1978 or subsequent NBCWA. 29 U.S.C. § 9706(a)(1). If there is no signatory operator that meets this criteria, the Commissioner must look to the employer that signed a 1978 or subsequent NBCWA and most recently employed the miner for any time period. *Id.*

§ 9706(a)(2). If the retired miner is not assigned under either of the above scenarios, the Coal Act directs the Commissioner to assign the miner "to the signatory operator which employed the ... retiree ... for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement." *Id.* § 9706(a)(3). Based on section 9706(a)(3), the Social Security Commissioner required Eastern to pay premiums for more than 1,000 retired miners who had worked for Eastern before 1966, despite the fact Eastern had last signed an NBCWA in 1964, and had transferred its coal-related operations to a subsidiary.[2]

Eastern sued the Commissioner and the Combined Fund and its trustees in federal district court, arguing that the Coal Act, both on its face and as applied, violated its substantive due process rights, and amounted to an unconstitutional taking of its property rights. *Eastern Enterprises v. Apfel,* 524 U.S. at 516, 118 S.Ct. at 2143. The district court granted summary judgment for the defendants, and the First Circuit Court of Appeals affirmed. *Id.* at 516, 118 S.Ct. at 2143.

■ A plurality of the United States Supreme Court disagreed with the lower courts, however. Specifically, four Justices distinguished *Turner Elkhorn,* and found the Coal Act constituted a compensable taking as applied to Eastern. *Id.* at 536–40, 118 S.Ct. at 2153–54. Justice O'Connor, writing for the plurality, summarized relevant Supreme Court cases evaluating the constitutionality of economic legislation. *Id.* at 522–36, 118 S.Ct. at 2146–53. Although the plurality acknowledged the differing analytical approach taken in *Turner Elkhorn* and *Pension Benefit Guaranty Corp.,* it chose to evaluate Eastern's taking argument under a three-part test used in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).[3] *Id.* at 524–27,

118 S.Ct. at 2147–48. Under this test, three factors are relevant in determining whether a regulatory taking has occurred: 1) economic impact; 2) whether the law interferes with investment-backed expectations; and 3) the nature of the government action. *Id.* at 526, 118 S.Ct. at 2148.

With regard to the first factor, the plurality found that Eastern's total payments under the Act would exceed $50 to $100 million, which it found was not in proportion " 'to its experience with the plan.' " *Id.,* at 530, 118 S.Ct. at 2149 (quoting *Concrete Pipe & Products of Cal., Inc. v. Const. Laborers Pension Trust for Southern Cal.,* 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). Eastern's liability under the Coal Act, therefore, amounted to a "significant economic burden." *Id.,* at 532, 118 S.Ct. at 2151. The plurality also found application of the Coal Act to Eastern "substantially interfere[d] with Eastern's reasonable investment-backed expectations." *Id.,* at 532, 118 S.Ct. at 2151. As explained by the Court, "even though the Act mandates only the payment of future health benefits, it nonetheless 'attaches new legal consequences to [an employment relationship] completed before its enactment.' " *Id.,* at 532, 118 S.Ct. at 2151 (quoting *Landgraf v. USI Film Products,* 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Lastly, with regard to the nature of the governmental action, the plurality found the Act's remedy "quite unusual." *Id.,* at 537, 118 S.Ct. at 2153. The plurality recognized Congress' authority to enact legislation to address a "grave" economic problem. It then found, however, that because application of the Coal Act to Eastern "singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and *unrelated to any commitment that the employers made or to any injury they caused* ...," an unconstitutional taking had occurred. *Id.,* at 537, 118 S.Ct. at 2153 (emphasis added).[4] Because it

---

**2.** Another provision of the Act provides that if a signatory is no longer in business, the Commissioner may levy premiums against a "related person," such as a successor in interest, or an entity under common control. 26 U.S.C. § 9701(c)(2)(A).

**3.** The plurality subsequently distinguished the facts of *Turner Elkhorn* from those involving application of the Coal Act to Eastern. 524 U.S. at 534–38, 118 S.Ct. at 2152–53. The significance of this distinction is addressed in part II(B)(2) below.

found that application of the Coal Act to Eastern violated the Takings Clause, the plurality declined to address Eastern's due process arguments. In doing so, however, Justice O'Connor expressly noted the Court's previous reluctance to use the Due Process Clause "to invalidate economic legislation." *Id.*, at 537, 118 S.Ct. at 2153.

Justice Kennedy disagreed that the Act amounted to an unconstitutional taking. *Id.* at 542–48, 118 S.Ct. at 2156–58 (Kennedy, J., concurring). As explained by Justice Kennedy:

> The Coal Act neither targets a specific property interest nor depends upon any particular property for the operation of its statutory mechanisms. The liability imposed on Eastern no doubt will reduce its net worth and its total value, but this can be said of any law which has an adverse economic effect.

*Id.*, at 543, 118 S.Ct. at 2156. He nevertheless concurred in the judgment based on his belief that application of the Coal Act to Eastern Enterprises under the facts given was so egregious as to "violate the proper bounds of settled due process principles." *Id.*, at 550, 118 S.Ct. at 2159–60 (Kennedy, J., concurring).

Four Justices dissented, agreeing that the Takings Clause did not apply when the interest at issue was not "physical or intellectual property, but an ordinary liability to pay money, and not to the Government, but to third parties." *Id.*, at 554, 118 S.Ct. at 2162 (Breyer, J., dissenting). The dissenting Justices also found that application of the Coal Act to Eastern was not "fundamentally unfair," and therefore, was not violative of Eastern's due process rights. *Id.*, at 558, 118 S.Ct. at 2164 (Breyer, J., dissenting). As reasoned by Justice Breyer, Eastern "knew or should have known" of the future problems facing the industry, and could not "show a sufficiently reasonable expectation that it would remain free of future health care cost liability for the workers whom it employed." *Id.*, at 567, 118 S.Ct. at 2168 (Breyer, J., dissenting).

4. It is important to note, however, that the plurality specifically limited its holding to "the spe-

The primary issue facing this Court with regard to the three pending motions is whether, and to what extent, *Eastern Enterprises* governs the present CERCLA action, thereby displacing the Eighth Circuit's decision in *NEPACCO*. Because it is potentially dispositive of the two motions filed by Dico, the Court will focus its analysis on the United States' motion to strike.

## II. MOTION TO STRIKE

### A. Governing Law

Rule 12(f) of the Federal Rules of Civil Procedure provides in relevant part that "the court may order stricken from any pleading any insufficient defense...." Fed.R.Civ.P. 12(f). "An affirmative defense is insufficient if it is not recognized as a defense to the cause of action." *Kelley v. Thomas Solvent Co.*, 714 F.Supp. 1439, 1442 (W.D.Mich.1989).

▆▆▆ Motions to strike are not favored by the courts. *See e.g. Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir.1977). "A motion to strike a defense will be denied if the defense is sufficient as a matter of law or if it fairly presents a question of law or fact which the court ought to hear." (citing *Moore's Federal Practice* § 12.21, at 2437 (2d ed.1975)). Nevertheless, a motion to strike should be granted if it " 'may have the effect of making the trial of the action less complicated, or [it] may have the effect of otherwise streamlining the ultimate resolution of the action.' " *Kelley v. Thomas Solvent Co.*, 714 F.Supp. at 1442 (quoting *California v. United States*, 512 F.Supp. 36 (N.D.Cal.1981)).

### B. Whether Dico's Sixth and Seventh Affirmative Defenses Should be Stricken

#### 1. Whether *Eastern Enterprises* Governs the Present Action

In urging this Court to strike Dico's sixth and seventh affirmative defenses, the United States claims that *Eastern Enterprises* establishes no binding precedent with regard to the present action, and in fact reaffirms the applicable analysis for CERCLA constitu-

cific circumstances of this case." *Eastern Enterprises v. Apfel*, 524, at 537, 118 S.Ct. at 2153.

tionality set forth in *Turner Elkhorn,* and employed by the Eighth Circuit in *NEPAC-CO.* This Court agrees.

As set forth above, although five justices found application of the Coal Act to Eastern unconstitutional, only four of those justices based their decisions on the Takings Clause. *See Eastern Enterprises v. Apfel,* 524 U.S. at 537, 118 S.Ct. at 2153. Justice Kennedy concurred in the judgment based on his belief that Eastern's *due process* rights had been violated. *Id.* at 546–51, 118 S.Ct. at 2158–60 (Kennedy, J., concurring). He sided with the four *dissenting* judges, however, in opining that application of the Coal Act to Eastern did not violate the Takings Clause. *Id.* at 539–48, 118 S.Ct. at 2154–58 (Kennedy, J., concurring). This type of "fragmented" decision provides only limited precedential value:

> "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds....'"

*Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). The Eighth Circuit also has applied *Marks v. United States* to evaluate split opinions. *See United States v. Thomas,* 20 F.3d 817, 823 n. 4 (8th Cir.1994).

Justice Kennedy's concurrence in *Eastern Enterprises* cannot be said to provide a "narrower ground" upon which this Court can derive a majority holding. As explained by the District of Columbia Third Circuit Court of Appeals in *Association of Bituminous Contractors, Inc. v. Apfel:*

> We have previously held that the rule of *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), under which the opinion of the Justices concurring in the judgment on the "narrowest grounds" is to be regarded as the Court's holding, does not apply unless the narrowest opinion represents a "common denominator of the Court's reasoning" and "embod[ies] a position implicitly approved by at least five Justices who support the judg-

ment." *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir.1991). Justice Kennedy's due process analysis clearly does not meet this standard because he alone was willing to invalidate economic legislation on the ground that it violated the Due Process Clause. And, as should be obvious, Justice Kennedy's due process reasoning can in no sense be thought a logical subset of the plurality's taking analysis. In short, the government is correct in stating that the only binding aspect of *Eastern Enterprises* is its specific result—holding the Coal Act unconstitutional as applied to Eastern Enterprises.

*Association of Bituminous Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1253–54 (D.C.Cir. 1998). In *Unity Real Estate Co. v. Hudson,* 178 F.3d 649, 658–659 (3rd Cir.1999), another Coal Act case, the Third Circuit recently reached a similar conclusion:

> There is a fundamental conceptual difference between a takings claim and a substantive due process claim. If the government pays just compensation, it may take property for public use under the Takings Clause. Due process protections, by contrast, define what the government may not require of a private party at all. It is the difference between a liability rule and a property rule. To be sure, in this case the result of the two claims would be the same because the only potential taking is the imposition of a monetary obligation, *but neither constitutional ground is a more limited version of the other.*

(Emphasis added) (internal citation omitted). In view of the Eighth Circuit's previous reliance on *Marks,* this Court believes the Eighth Circuit would follow the District of Columbia and Third Circuit's conclusions that *Eastern Enterprises* does not establish binding precedence on the issue of regulatory takings.

In its resistance to the present motion to strike, Dico attempts to create a "majority" holding by asserting that five justices—the plurality and Justice Kennedy—found that application of the Coal Act to Eastern violated fundamental principles of fairness. *Eastern Enterprises v. Apfel,* 524 U.S. at 534–38, 118 S.Ct. at 2152–53 (O'Connor, J.); *Id.* at

546–51, 118 S.Ct. at 2158–60 (Kennedy, J., dissenting). Dico further states: "The same majority agreed on the characteristics to examine and the test to apply to determine whether an economic retroactive law could survive scrutiny." Dico's Combined Memorandum in Support of Motion for Judgment on the Pleadings and Resistance to Plaintiff's Motion to Strike ("Dico's Combined Memorandum"), at 11. That Justice O'Connor's Takings Clause analysis and Justice Kennedy's Due Process Clause analysis may both have turned on "issues of fairness," however, does not change the fact the two opinions were premised on distinct constitutional principles. They cannot now be combined in an attempt to establish a "majority rule." *See Unity Real Estate Co. v. Hudson*, 178 F.3d at 649, 658–659 (declining to find binding precedent by combining the *Eastern Enterprises* plurality and concurring opinions when neither of the constitutional grounds upon which each are based "is a more limited version of the other."). *See also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 66, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (Court overruled plurality decision in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), explaining *Union Gas* was "of questionable precedential value, largely because a majority of the Court expressly disagreed with the rationale of the plurality").

■ In short, the only rationale embraced by at least five judges in *Eastern Enterprises* is that retroactive application of the Coal Act to Eastern did not violate the Takings Clause. It therefore remains settled in this circuit that retroactive application of CERCLA does not violate either the Due Process or Takings Clauses. *NEPACCO*, 810 F.2d at 734.

The Court's finding is consistent with other courts interpreting the precedential value of *Eastern Enterprises*. In addition to *Association of Bituminous Contractors, Inc.*, and *Unity Real Estate Co.*, both of which found Eastern Enterprises had no precedential value for subsequent Coal Act cases, two federal district courts have concluded—albeit summarily—that *Eastern Enterprises* has no impact on CERCLA liability. *United States v.*

*Vertac Chem. Corp.*, 33 F.Supp.2d 769, 784 (E.D.Ark.1998); *United States v. J.B. Stringfellow*, CV–83–2501 JMI (C.D.Cal. Sept. 11, 1998), attached as Exhibit C to the United States' Motion to Strike.

### 2. Whether Dico's Defenses Nevertheless Survive *NEPACCO*

Dico argues that even if this Court finds *Eastern Enterprises* does not apply to the present CERCLA action, its sixth and seventh affirmative defenses nevertheless remain viable under *NEPACCO*. According to Dico, *NEPACCO* cannot serve as binding precedent as to whether retroactive application of CERCLA violates the Takings Clause because the court dismissed the issue without any substantive analysis. Dico states in its memorandum: *"Not one word* of the [*NEPACCO*] opinion addresses the taking issue as presented to this Court." Dico's Combined Memorandum, at 12 (emphasis added).

Counsel for Dico is urged to reread the *NEPACCO* decision. In that case, the Eighth Circuit issued its Takings Clause opinion in two parts. First, the court found the appellants lacked standing to raise the issue due to their lack of a property interest in the contaminated farmland at issue. *NEPACCO*, 810 F.2d at 734. The court *then* stated as follows:

> Second, we hesitate to characterize the government's cleanup as a taking at all; the government's cleanup of the Denney farm site *has not deprived the property owner of any property interest....*Instead, the government's cleanup of the site abated an "imminent and substantial endangerment" to the public health and the environment, thus eliminating a public nuisance and restoring value to the property by removing the hazardous substances.

*Id.* (emphasis added) (internal citations omitted). In short, the *NEPACCO* court devoted more attention to the due process issue than to the taking issue simply because, like Justice Kennedy and the dissenters in *Eastern Enterprises*, the *NEPACCO* court did not believe the Takings Clause applied to the facts at hand. *See Eastern Enterprises v. Apfel*, 524 U.S. at 542–46, 118 S.Ct. at 2156–58 (Kennedy, J., concurring); *Id.* at 552–56,

118 S.Ct. at 2161–62 (Breyer, J. dissenting). Further support for this interpretation is gleaned from the *NEPACCO* court's citation to *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 216–17 (W.D.Mo.1985), in which the court also concluded that the appropriate analysis fell under the Due Process Clause.

Lastly, Dico argues *Eastern Enterprises* abandoned the *Turner Elkhorn* test, on which the *NEPACCO* court based its due process analysis, thus preventing *NEPACCO* from serving as binding precedent on that issue. Again, this Court disagrees. The *Eastern Enterprises* court did not abandon, but rather, *distinguished Turner Elkhorn* based on a differing factual scenario. *Eastern Enterprises v. Apfel*, 524 U.S. at 534–38, 118 S.Ct. at 2152–53. Specifically, the plurality found that the statute at issue in *Turner Elkhorn*, the Black Lung Benefits Act of 1972, "merely imposed 'liability for the effects of disabilities bred in the past'" that was justified as a "rational measure" to spread the cost among the employers involved. *Id.* at 535, 118 S.Ct. at 2152 (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). In *Eastern Enterprises*, however, the Court found the health problems of the workers and their dependents for which Eastern was being held responsible were not necessarily connected with the workers' former employment with Eastern or other signatory operators. *Id.* at 537, 118 S.Ct. at 2153.

The Court finds the state of the law settled in this circuit with regard to both of the arguments raised in Dico's sixth and seventh affirmative defenses. Because this Court is bound by the Eighth Circuit precedent in *NEPACCO*, the Court finds Dico's sixth and seventh affirmative defenses to be without merit, and thus, orders them stricken from the record. Such a result undoubtedly will render the trial less complicated, thus "'streamlining the ultimate resolution of the action.'" *Kelley v. Thomas Solvent Co.*, 714 F.Supp. at 1442 (quoting *California v. United States*, 512 F.Supp. 36 (N.D.Cal.1981)).

### III. DICO'S REMAINING MOTIONS

Based on the Court's disposition in part II, above, it is unnecessary to substantively address Dico's motions.

### IV. CONCLUSION

For the reasons set forth above, the United States' motion to strike Dico's sixth and seventh affirmative defenses is GRANTED. Dico's motion to amend issues for trial is DENIED. Dico's motion for judgment on the pleadings is DENIED.

IT IS SO ORDERED.