**COMMONWEALTH EDISON COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–269C.

United States Court of Federal Claims.

Feb. 3, 2000.

Robert A. Mangrum, Winston & Strawn, Washington, D.C., attorney of record for plaintiff.

Theodore R. Carter III, U.S. Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for defendant.

OPINION

ALLEGRA, Judge:

This case is before the court on plaintiff's motion to stay the proceedings and defendant's motion to dismiss under RCFC

12(b)(4). Plaintiff's complaint alleges that a special assessment imposed by the Energy Policy Act of 1992, 42 U.S.C. § 2297g *et seq.*, is unlawful as either effectuating a taking or an illegal exaction. After careful consideration of the briefs filed by the parties, the oral argument, and for the reasons discussed below, the court DENIES plaintiff's motion to stay these proceedings and GRANTS defendant's motion to dismiss.

## VI. Facts

Plaintiff, Commonwealth Edison Company, is a domestic utility company located in Chicago, Illinois, engaged in the sale and distribution of electrical power generated from nuclear reactors. Plaintiff's nuclear reactors utilize a form of uranium enriched with the U–235 isotope. Starting in 1969, plaintiff began purchasing uranium enrichment services from the government under a series of multi-year contracts. These services were initially provided by the Atomic Energy Commission (AEC), later by the Energy Research and Development Administration in 1974 and, ultimately, by the Department of Energy (DOE) in 1977.

Under the uranium enrichment contracts, plaintiff delivered low-grade uranium to the government to be enriched. The enrichment services were measured in terms of "separative work units" (SWUs). Plaintiff paid for the services by multiplying the number of SWUs provided by the unit price established by the terms of the governing contract. Although the terms of the contracts varied over the years, all the contracts contained essentially identical pricing provisions that based the charge for the government's services upon a contractually defined "established pricing policy," i.e., the price in effect at the time the service was performed. Further, many of the contracts included a "ceiling charge" that limited the maximum unit charge for enrichment services. In 1984, the government developed a standard requirements-type contract for uranium enrichment services referred to as a Utility Services Contract. In July 1984, plaintiff entered into a Utility Services Contract after terminating all of its existing uranium enrichment contracts with the government through a Supplemental Agreement of Settlement ("Settlement Agreement"). Similar to the prior contracts, the Utility Services Contract charged plaintiff for the enrichment services according to "the established DOE pricing policy" and included a ceiling charge.

In the late 1980s, Congress recognized that the government's uranium enrichment facilities would have to be decontaminated and decommissioned. The DOE estimated that the total cost of this clean-up could exceed $20 billion over 40 years. To address this problem, Congress passed the Energy Policy Act of 1992, 42 U.S.C. §§ 2297g *et seq.* (1994), creating a Uranium Enrichment Decontamination and Decommissioning Fund that would accumulate the funds required to clean-up the uranium enrichment facilities. The Act provides that monies deposited into the Fund would derive from two sources: (i) up to $150 million per fiscal year (to be annually adjusted for inflation using the Consumer Price Index) would be collected as a special assessment from domestic utility companies which purchased and used the enrichment services; and (ii) the balance, up to $330 million annually (adjusted again for inflation), would be provided from public funds appropriated by Congress. *See* § 2297g–1(b)–(d). Further, the Act states that the collection of monies would cease after the earlier of 15 years after October 24, 1992, or the collection of $2.25 billion (adjusted again for inflation) from the domestic utility companies. *See* § 2297g–1(e).

The Act provides that the special assessment imposed on each domestic utility is based on the percentage of SWUs purchased from the DOE relative to the total number of SWUs produced by the DOE. *See* § 2297g–1(c). Under the Act, a domestic utility is considered to have purchased a SWU if the SWU was originally produced by DOE, even if the utility purchased it from another source; conversely, a utility is not considered to have purchased a SWU if it resold the SWU to another utility. *Id.* Thus, the Act imposes the assessment only on those domestic utilities that ultimately benefited from the

DOE's enrichment services.[1] Domestic utilities that are subject to the special assessment are permitted, under the Act, to treat the assessment as "a necessary and reasonable current cost of fuel" which "shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel cost." *See* § 2297g–1(g).

Since passage of the Act in October 1992, DOE has annually billed plaintiff for its pro-rata share of the special assessment. Plaintiff claims that it has paid in excess of $95.5 million to the Fund. In June of 1995, this court addressed a domestic utility's challenge to the Energy Policy Act's special assessment in *Yankee Atomic Elec. Co. v. United States*, 33 Fed.Cl. 580 (1995). In its decision, this court determined that the special assessment was an illegal exaction under the Takings Clause of the Fifth Amendment because it retroactively increased the price utilities paid for uranium enrichment services in breach of the contracts between the utilities and the government. *Id.* at 584–85. Plaintiff, like many other domestic utilities subject to the special assessment, filed suit in this court on April 1, 1997, challenging the legality of the special assessment imposed by the Energy Policy Act. Plaintiff's complaint alleged that the special assessment breached plaintiff's contracts with defendant by retroactively increasing the cost of the uranium enrichment services and constituted a taking in violation of the Takings Clause of the Fifth Amendment.

On May 6, 1997, while plaintiff's case was pending before this court, the Federal Circuit reversed the Court of Federal Claim's decision in *Yankee Atomic*, finding that the fee assessed under the Energy Policy Act constituted "a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Yankee Atomic Electric Co. v.*

*United States*, 112 F.3d 1569, 1577 (Fed.Cir. 1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998). Thus, the Federal Circuit concluded that the special assessment did not breach any contact rights and "[b]ecause the contracts did not contain an unmistakable promise against a future assessment, Yankee Atomic had no property right (via a vested contract right) which was subsequently taken by the assessment." *Id.* at 1580 n. 8. After the Federal Circuit issued its decision in *Yankee Atomic*, plaintiff, along with numerous other domestic utility companies, filed suit on June 12, 1998, in the United States District Court for the Southern District of New York, seeking both a declaratory judgment that the Energy Policy Act is unconstitutional and injunctive relief from future assessments under the Act. On November 2, 1998, plaintiff filed a motion to stay the proceedings in the instant case pending resolution of the case before the Southern District of New York ("the district court action").[2]

Plaintiff then filed an amended complaint in the instant case on February 2, 1999. In its amended complaint, plaintiff distanced itself from the contract-based claims that were rejected by the Federal Circuit in *Yankee Atomic* by alleging that the special assessment constitutes: (i) an unlawful taking of money in violation of the Takings Clause of the Fifth Amendment; (ii) an illegal exaction in violation of the Due Process Clause of the Fifth Amendment; and (iii) an unlawful taking of its contract rights distinguishable from the issues litigated in *Yankee Atomic*. On February 10, 1999, defendant filed a motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted. Oral argument on the motion to dismiss was held on November 2, 1999.

## II. Motion for Stay

The court turns first to plaintiff's motion to stay this case. "The power of a federal trial

---

1. Two groups of purchasers of enrichment services are exempt from the special assessment: (i) domestic customers who purchased USEC services any time after 1992; and (ii) foreign utilities, who represented 25% of DOE's pre–1992 customer base. *See Omaha Public Power District v. United States*, 44 Fed.Cl. 383, 386 (1999).

2. On November 25, 1998, the district court denied defendant's motion to stay the district court action pending resolution of the case before this court. *See Consolidated Edison Co. v. United States*, 30 F.Supp.2d 385 (S.D.N.Y.1998).

court to stay its proceedings … is beyond question." *Cherokee Nation of Oklahoma v. United States,* 124 F.3d 1413, 1416 (Fed.Cir. 1997) (citing *Landis v. North American Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936)). "When and how to stay proceedings is within the sound discretion of the trial court." *Id.*

▆ The Federal Circuit has identified a tripartite formula for trial courts to employ when deciding whether to stay a case: (i) "a trial court must first identify a pressing need for the stay;" (ii) "[t]he court must then balance interests favoring a stay against interests frustrated by the action;" and (iii) "[o]verarching this balancing is the court's paramount obligation to exercise jurisdiction timely in cases properly before it." *Cherokee Nation,* 124 F.3d at 1416. In addition, where a related case is pending before another court, as is true here, a trial court should also consider: (i) principles of comity, with the normal rules favoring the court in which a case is first filed, *Northrop Corp. v. United States,* 27 Fed.Cl. 795, 801 (1993); (ii) judicial economy, focusing, *inter alia,* on whether a stay is necessary to avoid duplicative litigation, *Haustechnik v. United States,* 34 Fed. Cl. 740, 745 (1996); and (iii) the motives of the party seeking the stay, with courts disfavoring stays where the movant is seeking to avoid adverse precedent, *Adrienne Village v. United States,* 25 Cl.Ct. 457, 459–61 (1992).

▆ Applying these factors to the instant case, this court concludes that the plaintiff's motion to stay these proceedings should be denied for several reasons. First, as discussed below, it appears that, contrary to plaintiff's claims, this court has the jurisdiction to rule on each of the counts in the amended complaint and thus need not defer

to the district court's broader jurisdiction. As such, the balancing as to whether to stay this case tips decidedly in favor of this court timely exercising jurisdiction in a case properly before it. Second, in denying the stay, this court is influenced by the simple fact that this case was filed before the district court action, suggesting that, under the principles of comity identified above, resolution of this case ought to take precedence.[3] *See also Northwest Airlines, Inc. v. American Airlines, Inc.,* 989 F.2d 1002, 1005 (8th Cir.1993)(citing *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.,* 920 F.2d 487, 488–89 (8th Cir.1990)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 675 F.2d 1169, 1174 (11th Cir.1982). Finally, this court is troubled by plaintiff's motive in seeking this stay, which, despite its protests to the contrary, is plainly underlain by the hope that, while this court yields, the district court will proceed and, in rendering its decision, not follow the Federal Circuit's decision in *Yankee Atomic.* While plaintiff certainly is within its rights in joining the district court action, this court need not countenance such legal gamesmanship, the evident purpose of which is to circumvent what would otherwise be binding precedent. *See Garber v. Sir Speedy, Inc.,* 930 F.Supp. 267, 271 (N.D.Tex. 1995) ("Litigants should be discouraged from filing suits in courts with concurrent jurisdiction for the purpose of avoiding adverse rulings in the court in which the action was originally filed."), *aff'd,* 91 F.3d 137 (5th Cir. 1996).

In sum, this court believes that it is solemnly obliged to exercise the jurisdiction that the plaintiff itself properly invoked prior to joining the action in the district court. Accordingly, this court concludes that plaintiff's motion for stay should be denied.[4]

---

3. The district court's failure to stay its proceedings in the related case may well be attributable to representations made to that court indicating that this court lacked jurisdiction to resolve all the issues presented by the plaintiff's complaint. *See* Plaintiff Utilities' Memorandum of Law in Opposition to the Government's Motion to Stay (March 10, 1999) at 14–16. As further discussed in detail below, these representations were, in this court's view, erroneous.

4. The court is aware that other judges of this court have stayed cases involving the special

assessment imposed by the Energy Policy Act, choosing to allow the district court action to proceed. *See, e.g., New York Power Authority v. United States,* 42 Fed.Cl. 795 (1999). It appears that the circumstances in those cases were somewhat different, particularly in terms of the timing of the motion for stay as compared to the procedural posture of the case before this court. However, to the extent these rulings are based upon the view that this court cannot consider whether the special assessment constitutes an

## III. Motion to Dismiss

When a federal court reviews the sufficiency of the complaint pursuant to a motion to dismiss, "its task is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* Toward this end, "the allegations of the complaint should be construed favorably to the pleader." *Id.* *See also Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *See Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988).

■ Plaintiff's amended complaint contains three counts. The first alleges that the Act's special assessment constitutes an unlawful taking of money in violation of the Fifth Amendment. The second alleges that the special assessment imposes a disproportionate and extremely retroactive liability—a so-called "illegal exaction"—in an arbitrary and irrational manner in violation of the Due Process Clause of the Fifth Amendment. The third and final count alleges that the imposition of the special assessments constitutes a taking of the fruits of its contractual agreements with the government. The court will consider these counts each in turn. But, since the result of this analysis potentially centers on the Federal Circuit's *Yankee Atomic* decision, which is binding precedent,[5] the court will begin by examining that decision.

## A. The *Yankee Atomic* decision.

In *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569 (Fed.Cir.1997), the Federal Circuit reversed the Court of Federal Claims' grant of summary judgment to the utility company Yankee Atomic. This court had determined that the special assessment imposed on domestic utility companies pursuant to the Act breached Yankee Atomic's prior contracts with the government and constituted an illegal exaction under the Takings Clause of the Fifth Amendment. *See Yankee Atomic Electric Co. v. United States*, 33 Fed. Cl. 580 (1995). Yankee Atomic had alleged the special assessment breached its contracts with the government by retroactively increasing the price it had to pay for previously supplied uranium enrichment services. According to the Federal Circuit, the resolution of Yankee Atomic's claim hinged on whether the special assessment was more accurately characterized "as a retroactive price increase rather than an exercise of the sovereign's taxing power." 112 F.3d at 1573. To distinguish between these characterizations, the court relied upon two related bodies of law: the sovereign acts doctrine and the unmistakability doctrine.

The Federal Circuit noted that the Supreme Court had recently discussed the sovereign acts doctrine in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). *Yankee Atomic*, 112 F.3d at 1574. Describing the plurality opinion in *Winstar*, the Federal Circuit stated that, under the sovereign acts doctrine, "[t]he Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties." 112 F.3d at 1575. *See also Winstar*, 518 U.S. at 891–98, 116 S.Ct. 2432. At the same time, the sovereign acts doctrine recognizes that "the Government-as-sover-

---

illegal exaction, *see id.* at 801, this court, for the reasons discussed below, respectfully disagrees.

5. Under the doctrine of *stare decisis*, questions of law decided by the United States Court of Appeals for the Federal Circuit constitute binding precedent upon this Court. *See Compliance Corp. v. United States*, 22 Cl.Ct. 193, 204–05 n. 9 (1990), *aff'd*, 960 F.2d 157 (Fed.Cir.1992). *See*

*also* 18 James Wm. Moore et al., *Moore's Federal Practice* ¶ 134.02[3] (3rd ed.1998). Of course, *stare decisis* applies "only to legal issues that were actually decided in a prior action" and not to issues that were neither "litigated [nor] resolved." *Beacon Oil Co. v. O'Leary*, 71 F.3d 391, 395 (Fed.Cir.1995)

eign must remain free to exercise its powers," lest every general enactment of Congress be viewed as the evasion of a contract. 112 F.3d at 1575.[6] The Federal Circuit indicated that determining whether the Government, in passing legislation, is acting as a contractor or a sovereign, requires "a case specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." *Id.*

Applying this analysis to the Energy Policy Act, the Federal Circuit concluded that that legislation was not designed to alter or affect the Government's prior contracts. In reaching this conclusion, the Federal Circuit was heavily influenced by the fact that the special assessment applies *not to* the utilities that had contracted for uranium enrichment services, but rather to the utilities that ultimately received the enriched uranium and thus benefited from the DOE services. Summarizing this finding, the Federal Circuit stated:

> The reach of the Act, therefore, makes clear that Congress was not focused on a retroactive increase in the price of the Government's prior contractual agreements. Rather than targeting those utility companies that had prior contracts with the Government, the Act targets whichever utility eventually used and benefited from the DOE's enrichment services. Congress's main purpose was to spread the costs of a problem that it realized only after the contracts had been performed.

*Id.* at 1575–76. The court thus concluded that the assessment essentially was "a general tax that falls proportionally on all utilities that benefited from the DOE's uranium en-

richment services," noting further that "[a]ny impact that this approach may have on those utilities with which the Government had prior contracts is 'merely incidental to the accomplishment of a broader governmental objective.'" *Id.* at 1576 (*quoting Winstar,* 518 U.S. at 897, 116 S.Ct. 2432). *See also O'Neill v. United States,* 231 Ct.Cl. 823, 826 (1982). The court noted, however, that this was not the end of its inquiry as it still had to determine whether the Government, in its contracts with Yankee Atomic, had unmistakably surrendered the right to exercise its sovereign taxing power.

Harkening again to the *Winstar* plurality opinion, the Federal Circuit described the "modern unmistakability doctrine" as "allowing the Government to make agreements that bind future Congresses, but only if those contracts contain an unmistakable promise." 112 F.3d at 1578. Explaining further the limits of this doctrine, the Federal Circuit highlighted the following passage from *Winstar:*

> [A] contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power.

*Id.* at 1578 (*quoting Winstar,* 518 U.S. at 878, 116 S.Ct. 2432).[7] Analyzing the contracts between Yankee Atomic and the government, the Federal Circuit first found that they did not contain an express statement that Yankee Atomic would be "immune from any future assessments made by the Government upon the industry as a whole." 112 F.3d at 1579. The court next determined

---

6. *See also Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925)("The United States when sued as a contractor cannot be held liable for an obstruction of the performance of the particular contract resulting from its public and general acts as a sovereign"); *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.1990), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990); *Tony Downs Foods Co. v. United States,* 209 Ct.Cl. 31, 530 F.2d 367, 370 (1976); *Coast-to-Coast Financial Corp. v. United States,* 45 Fed.Cl. 796 (2000). *See generally,* Gerard Wimberly & Kristen Amerly,

*The Sovereign Acts Doctrine After Winstar,* 6 Fed. Circuit B.J. 127 (1996).

7. *See also Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); Jean O. Melicious & Robert J. Thornton, *Contractual Ecosystem Management Under the Endangered Species Act: Can Federal Agencies Make Enforceable Commitments?,* 26 Ecology L.Q. 489, 505–12 (1999).

that the fixed-price terms of the contract did not constitute an unmistakable promise that the government would not impose "a general assessment upon all utility companies that benefited from the DOE's uranium enrichment services" because the "language of the contract is directed at the prices charged for providing enriched uranium to Yankee Atomic, and not to any decontamination or decommissioning costs which may subsequently arise." *Id.* at 1580. Based upon these observations, the Federal Circuit concluded that the contracts "did not include an unmistakable promise that precluded the Government from later imposing an assessment upon all domestic utilities that employed the DOE's uranium enrichment services." *Id.*

The Federal Circuit determined that the absence of an unmistakable promise in the subject contracts resolved both Yankee Atomic's contract and takings arguments. In rejecting the breach of contract claim, the Federal Circuit observed that the Government had complied fully with the provisions of the contracts and that the subsequent special assessments were not "a deliberate retroactive increase in the price of those contracts," but rather "the Government's way of spreading the costs of the later discovered decontamination and decommissioning problem on all utilities that benefited from the Government's service." *Id.* at 1580. In rejecting the takings argument, the court explained:

> Because the contracts did not contain an unmistakable promise against a future assessment, Yankee Atomic had no property right (via a vested contract right) which was subsequently taken by the assessment. At most, Yankee Atomic has a vested right to be immune from later attempts to retroactively increase the prices charged. This right has not been taken because, as explained in the sovereign acts discussion, the assessment is a general, sovereign act rather than a retroactive price increase.

*Id.* at 1580 n. 8. The Federal Circuit thus sustained the application of the special assessment to Yankee Atomic.

Accordingly, *Yankee Atomic* concluded that the special assessment did not constitute a modification of the prior contracts, but rather an exercise of the sovereign taxing power. It further concluded that the exercise of that power was not unmistakably precluded by the contracts in question and that the imposition did not effectuate a taking of a vested contract right. With these lessons firmly in mind, the court now turns to an analysis of the individual counts in the plaintiff's amended complaint.

## B. The Individual Counts
### 1. Count I: Can There Be a Taking of Money?

Count I of plaintiff's amended complaint alleges that the Energy Policy Act's special assessment constitutes an unlawful taking of money in violation of the Fifth Amendment. This claim was not addressed by the *Yankee Atomic* court, which focused only on whether there had been an unconstitutional taking of the plaintiff's vested contracts. The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." In light of this language, determining whether this first count states a claim hinges on whether "money" can be deemed "property" for purposes of the Takings Clause.

In arguing that the financial burden imposed by the special assessment constitutes a taking, plaintiff relies heavily on the Supreme Court's decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). In *Eastern*, a plurality of the Supreme Court held that a provision of the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act), which required coal operators to fund the retirement health benefits of current and former employees, effected an unconstitutional taking of money, as applied to the petitioner Eastern Enterprises, because it placed a "severe, disproportionate, and extremely retroactive burden on Eastern" in violation of the Takings Clause. 524 U.S. at 538, 118 S.Ct. 2131. In so concluding, the plurality applied a regulatory taking analysis, focusing on " '[t]he economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action.' " *Id.* at 523–24, 118 S.Ct. 2131 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175,

100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). *See also Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)

As to the first of these factors, economic impact, the plurality held "there is no doubt that the Coal Act has forced a considerable financial burden upon Eastern." 524 U.S. at 529, 118 S.Ct. 2131. Regarding the second factor, the plurality found that the retroactivity of the Coal Act, which reached back to impose liability on activities occurring 30 to 50 years earlier, "interferes with Eastern's reasonable investment-backed expectations." *Id.* at 532, 118 S.Ct. 2131. Regarding this point, the plurality further observed that "the Coal Act operates retroactively, divesting Eastern of property long after the company believed its liabilities . . . . to have been settled." *Id.* at 534, 118 S.Ct. 2131. Finally, evaluating the third regulatory taking factor, the nature of the governmental action, the plurality found that funding retired coal miners' health benefits is the type of complex problem that typically calls for a legislative solution. *Id.* at 537, 118 S.Ct. 2131. The plurality, nonetheless, found that solution objectionable, concluding that "[w]hen . . . that solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused, the governmental action implicates fundamental principles of fairness underlying the Takings Clause." *Id.* As such, "in the specific circumstances of this case," the plurality adjudged, "we conclude that the Coal Act's application to Eastern effects an unconstitutional taking." *Id.*

In his concurring opinion, Justice Kennedy agreed the Coal Act was unconstitutional, but under the Due Process Clause and not under the plurality's Takings Clause analysis. His principal point of departure from the plurality's takings analysis was their failure to identify the specific property right or interest at stake. Mapping the contours of this disagreement, Justice Kennedy explained:

> Our cases do not support the plurality's conclusion that the Coal Act takes property. The Coal Act imposes a staggering financial burden on the petitioner, Eastern Enterprises, but it regulates the former mine owner without regard to property. It does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest. The Coal Act does not appropriate, transfer, or encumber an estate in land (*e.g.*, a lien on a particular piece of property), a valuable interest in an intangible (*e.g.*, intellectual property), or even a bank account or accrued interest. The law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply or the property it uses to do so. To the extent it affects property interests, it does so in a manner similar to many laws; but until today, none were thought to constitute takings. To call this sort of governmental action a taking as a matter of constitutional interpretation is both imprecise and, with all due respect, unwise.

524 U.S. at 540, 118 S.Ct. 2131. Burnishing his views further, Justice Kennedy opined: "True, the burden imposed by the Coal Act may be just as great if the Government had appropriated one of Eastern's plants, but the mechanism by which the Government injures Eastern is so unlike the act of taking specific property that it is incongruous to call the Coal Act a taking, even as that concept has been expanded by the regulatory takings principle." *Id.* at 542, 118 S.Ct. 2131.

While disagreeing with Justice Kennedy's conclusion that the Coal Act was unconstitutional, the four dissenting judges agreed "that the plurality views this case through the wrong legal lens," asserting that "[t]he Constitution's Takings Clause does not apply." 524 U.S. at 554, 118 S.Ct. 2131. Justice Breyer, speaking on behalf of the four dissenters, stated: "[t]he 'private property' upon which the Clause traditionally has focused is a specific interest in physical or intellectual property. . . . This case involves, not an interest in physical or intellectual property, but an ordinary liability to pay money. . . ." *Id.* Observing that "application of the Takings Clause here bristles with conceptual difficulties," Justice Breyer noted

that the plurality's analysis seemingly would apply to ordinary taxes and other statutes and rules that routinely create financial burdens for some that benefit others. *Id.* at 556, 118 S.Ct. 2131. In his view, questions involving the potential unfairness of imposing such monetary obligations find "a natural home" not in the Taking Clause, but in the Due Process Clause, "a Fifth Amendment neighbor." *Id.* The dissent ultimately concluded that the Coal Act did not violate the Due Process Clause, finding that it was neither fundamentally unfair nor unjust. *Id.* at 558–68, 118 S.Ct. 2131.

 Plaintiff urges this court to apply the plurality's takings analysis, but discerning a controlling rule of law from the welter of conflicting opinions in *Eastern* requires careful reflection. Regarding the precedential impact of such split decisions, the Supreme Court has instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....'" *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). However, the *Marks* rule is applicable only where "one opinion can be meaningfully regarded as 'narrower' than another" and can "represent a common denominator of the Court's reasoning." *Rappa v. New Castle County*, 18 F.3d 1043, 1057–58 (3d Cir.1994) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C.Cir. 1991) (en banc), *cert. denied*, 505 U.S. 1229,

112 S.Ct. 3054, 120 L.Ed.2d 920 (1992)). Thus, in cases where approaches fundamentally differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court. *Id.* at 1058. *See also Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (stating that a plurality view that does not command a majority is not binding precedent); *Hertz v. Woodman*, 218 U.S. 205, 213–14, 30 S.Ct. 621, 54 L.Ed. 1001 (1910) ("[T]he principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in [the Supreme Court] or in inferior courts").

As applied to *Eastern*, these principles mean that no part of the plurality's reasoning constitutes binding precedent. The plurality opinion and Justice Kennedy's concurrence agree in result and focus on similar facts, but share no common denominator in terms of legal rationale.[8] As such, the only part of the plurality opinion that is binding is the specific result—the Coal Act is unconstitutional as applied to Eastern. Citing *Marks*, numerous courts have recently agreed with this conclusion, observing that *Eastern* essentially leaves takings law unaffected. *See Holland v. Big River Minerals* Corp., 181 F.3d 597, 606 (4th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000)(noting that five justices reasoned that the takings analysis was inapplicable to the Coal Act "because no identifiable property interest was infringed by the legislation"); *Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 658–59 (3d Cir.1999), *cert. denied*, ——

---

**8.** In an earlier decision involving the Energy Policy Act, this court distilled the plurality and concurring opinions into the following "clear principle," to wit, "a liability that is severely retroactive, disruptive of settled expectations and wholly divorced from a party's experience may not constitutionally be imposed." *Omaha Public Power District v. U.S.*, 44 Fed.Cl. 383, 390 (1999). *See also Maine Yankee Atomic Power Co. v. United States*, 44 Fed.Cl. 372, 378–79 (1999); *Sacramento Municipal Utility District v. United States*, 44 Fed.Cl. 395, 401 (1999). While the court agrees with this statement as an observation, it does not believe that *Eastern* stands for this proposition under the rules normally applied in discerning the precedential impact of split decisions. In particular, this court believes that it is important to determine whether the constitutionality of the special assessment is amenable to a Takings Clause analysis, as opposed to a Due Process analysis. While each of these approaches has similarities, they are not identical and dwell on different factors. *See United States v. Dico, Inc.*, 189 F.R.D. 536, 542 (S.D.Iowa 1999)("That Justice O'Connor's Takings Clause analysis and Justice Kennedy's Due Process Clause analysis may both have turned on 'issues of fairness,' however, does not change the fact that the two opinions were premised on distinct constitutional principles. They cannot now be combined in an attempt to establish 'a majority rule' ").

U.S. ——, 120 S.Ct. 396, 145 L.Ed.2d 309 (1999); *Anker Energy Corp. v. Consolidated Coal Co.*, 177 F.3d 161, 169 (3d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 496, 145 L.Ed.2d 383 (1999); *Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1254 n. 5 (D.C.Cir.1998) (while indicating that *Eastern Enterprises* likely worked no change in the law of takings, stating that "[t]he only conceivable change in takings jurisprudence brought about by Eastern Enterprises is that the five dissenting justices . . . apparently believe that the imposition of liability alone is not a taking of property under the Fifth Amendment"); *United States v. Alcan Aluminum Corp.*, 49 F.Supp.2d 96, 98–99 (N.D.N.Y.1999)(same); *United States v. Dico, Inc.*, 189 F.R.D. 536, 542 (S.D.Iowa 1999)(same).[9] As such, this court must determine for itself whether money constitutes "property" within the meaning of the Takings Clause. Several reasons compel this court to agree with Justice Kennedy's concurrence in *Eastern Enterprises* and to conclude that the exercise of the taxing power, thereby creating a monetary obligation, is not subject to a takings analysis under the Fifth Amendment.

■ It is foundational juridical principle that a takings claim cannot succeed if a government action, through causing economic harm, "[does] not interfere with interests that [are] sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." *Penn Central Transp. Co.*, 438 U.S. at 125, 98 S.Ct. 2646. Accordingly, before a party can recover compensation under the Fifth Amendment for a taking, under either a physical invasion or regulatory taking theo-

ry, it must establish a compensable property interest, that is, a specific interest in physical or intellectual property. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (regulatory taking); *Kaiser Aetna*, 444 U.S. at 179–80, 100 S.Ct. 383 (physical invasion).[10] Accordingly, for count I of plaintiff's amended complaint to state a claim the money allegedly taken by the special assessment must constitute the type of "property" that is amenable to a takings analysis under the Fifth Amendment.

■ However, consistent with Justice Kennedy's concurrence in *Eastern*, as well as Justice Breyer's dissent, the courts have generally held that a government-imposed obligation to pay "money" is not susceptible to a taking analysis. These holdings take various forms. Some courts have squarely held that money is not "property" within the meaning of the Takings Clause. *See, e.g., Unity Real Estate Co.*, 178 F.3d at 674–78 (rejecting the application of a takings analysis to the tax imposed by the Coal Act); *Atlas Corp. v. United States*, 895 F.2d 745, 756 (Fed.Cir.1990)("Requiring money to be spent is not a taking of property.").[11] Other courts, taking a more transactional approach, have concluded that government-imposed obligations to pay money are not the sort of governmental actions subject to a takings analysis. *See Branch v. United States*, 69 F.3d 1571, 1576–77 (Fed.Cir.1995), *cert. denied*, 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996)("[T]he principles of takings law that apply to real property do not apply in the same manner to statutes imposing monetary liability."); *Meriden Trust & Safe Deposit Co. v. FDIC*, 62 F.3d 449, 455 & n. 2 (2d

9. *See also* Jack Decker Bristow, *Eastern Enterprises v. Apfel: Is the Court One Step Closer to Unraveling the Takings and Due Process Clauses?*, 77 N.C.L.Rev. 1525, 1526 (1999).

10. This court's decisions are to similar effect. *See Holden v. United States*, 38 Fed.Cl. 732, 735 (1997); *Flathead Joint Board of Control v. United States*, 30 Fed.Cl. 287, 293 (1993), *aff'd*, 59 F.3d 180 (Fed.Cir.1995).

11. Plaintiff cites *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), in support of its position that a taking of money can violate the Takings

Clause. In *Webb's*, the Supreme Court held that a state statute pursuant to which a county could take the interest accruing on an interpleader fund deposited in the registry of the county court was unconstitutional in violation of the Takings Clause of the Fifth and Fourteenth Amendments. *Id.* at 164–65. *Webb's* is distinguishable from the instant case because in *Webb's*, a specific property interest was at stake—the actual interest accruing on a specific, separately identifiable fund held in a court's registry. *Webb's* did not involve the taking of money based on the imposition of a financial burden in the nature of a tax, like the instant case.

Cir.1995) (per se takings analysis is inapplicable to congressional imposition of monetary liability); *Commercial Builders v. Sacramento,* 941 F.2d 872, 876 (9th Cir.1991), *cert. denied,* 504 U.S. 931, 112 S.Ct. 1997, 118 L.Ed.2d 593 (1992)(a purely financial exaction does not constitute a taking).[12] And still other courts have touched upon this issue in holding, for example, that monetary obligations incidentally imposed on a property holder as the result of the government's physical taking of real property (i.e., the cost of moving a business from condemned property) are not compensable. *See, e.g., United States v. General Motors Corp.,* 323 U.S. 373, 379–80, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Taken together, these cases lead this court to conclude that a government-imposed payment of money cannot result in a compensable taking.[13] *See Eastern,* 524 U.S. at 554, 118 S.Ct. 2131 (Breyer, J., dissenting) ("This case involves not an interest in physical or intellectual property, but an ordinary liability to pay money . . . .").

■ Even were money considered property for purposes of the Takings Clause, this court perceives a host of practical and theoretical problems with applying that constitutional mode of analysis to a simple obligation to pay funds to the government, particularly an obligation imposed under the taxing power. For example, in describing why a takings analysis does not fit an assessment of money, the Federal Circuit, in *Branch,* stressed:

> To be sure, analyzing the assessment under the principles of takings law is awkward. If a particular government action is deemed a taking, it means that the government may engage in the action but must pay for it. . . . But because the property allegedly taken in this case was money that leads to the curious conclusion that the government may take the bank's money as long as it pays the money back.

*Branch,* 69 F.3d at 1575–76.[14] This language in *Branch* hints at a deeper problem, involving the remedy available under the Takings Clause. Thus, while ordinarily a plaintiff stating a takings claim must concede the lawfulness of the actions of the government that gave rise to the alleged "taking," [15] here the thrust of plaintiff's claim is that the Energy Policy Act is unlawful and, effectively, should be unenforceable. Such a holding, however, cannot properly derive from the Takings Clause, which is not prohibitory, but rather compensatory, in nature. As observed by the Supreme Court in *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 314–15, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987): "[The Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power. This basic understanding of the Amendment makes clear that it is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." (emphasis in original) (citations omitted). *See also* Johnathan Sullivan, *supra,* at 1124–25. Accordingly, under the facts of this case, the Takings Clause simply does not provide a basis for holding the special assess-

---

**12.** *See also Garneau v. City of Seattle,* 147 F.3d 802, 818 n. 5 (9th Cir.1998) (Williams, J., concurring) (noting that "[o]ther courts have expressed discomfort in applying takings principles to actions challenging the constitutionality of government-mandated monetary payments.").

**13.** Indeed, one might argue that the plaintiff's taking claim is weaker than that of someone simply complaining about a government-imposed monetary obligation, because the Energy Policy Act allows the plaintiff to pass on to its customers, through rate hikes, the burden of the special assessment. *See* 42 U.S.C. § 2297g–1(g). Arguably, then, plaintiff's own money has been unaffected by the special assessment.

**14.** *See also* Johnathan Sullivan, Case Comment, *Eastern Enterprises v. Apfel: How Lochner Got it Right,* 60 Ohio St. L.J. 1103, 1125 (1999) ("The fair value of a specific sum of money is, obviously, the amount of money taken; the concept of a taking or of just compensation in this situation is simply impracticable.").

**15.** *See Crocker v. United States,* 37 Fed.Cl. 191, 195–96 (1997) (citing cases), *aff'd,* 125 F.3d 1475 (Fed.Cir.1997); *Perry v. United States,* 28 Fed.Cl. 82, 85 (1993)("A takings claim may only be based on the Government's rightful exercise of its property, contract, or regulatory powers.").

ment authorized by the Energy Policy Act unconstitutional.[16]

In sum, this tour d'horizon leads this to court believe, for a variety of reasons, that a takings analysis is inapplicable to count I. Accordingly, count I of the amended complaint must be dismissed.[17]

### 2. Count II—Is the Special Assessment an Illegal Exaction?

In count II of its amended complaint, plaintiff asserts that the special assessment is an "illegal exaction," alleging that it imposes a disproportionate and extremely retroactive liability in an arbitrary and irrational manner in violation of the Due Process Clause of the Fifth Amendment. A similar claim was not addressed by the *Yankee Atomic* court, which, though essentially characterizing the special assessment as a tax, did not consider whether the assessment violated the Due Process Clause of the Fifth Amendment.

Before turning to the merits of this count, the court must address an odd jurisdictional dispute, for plaintiff now argues that this court lacks jurisdiction to consider its illegal exaction claim. Plaintiff, however, has not sought to amend its complaint to drop this count, but instead argues that once the dis-

trict court rules in the related cases, jurisdiction over the illegal exaction claim will spring into existence. Defendant, for its part, disputes this and argues that this court has jurisdiction now to consider this claim. This court thus is obliged to determine whether it has jurisdiction over count II's illegal exaction claim.[18] *See Puerto Rico v. United States*, 44 Fed.Cl. 618, 623 (1999) ("The court always has the right—indeed the obligation—to consider its own jurisdiction")(quoting *Clark v. United States*, 229 Ct.Cl. 570, 576, 1981 WL 22060 (1981)(Harlan, J., concurring)).

 The Court of Federal Claim's "jurisdiction is limited to such cases where the Constitution or a federal statute requires the payment of money damages as compensation for the violation." *Murray v. United States*, 817 F.2d 1580, 1582–83 (Fed.Cir. 1987), *aff'd*, 864 F.2d 148 (Fed.Cir.1988), *cert. denied*, 489 U.S. 1055, 109 S.Ct. 1318, 103 L.Ed.2d 587 (1989) (citing *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), and *United States v. Testan*, 424 U.S. 392, 401–02, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). *See also Lyashenko v. United States*, 41 Fed.Cl. 626, 628 (1998).

---

**16.** The Supreme Court reached a similar conclusion in *United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). In *Sperry Corp. v. United States*, 12 Cl.Ct. 736 (1987), plaintiff attacked the constitutionality of section 502 of the Foreign Relations Authorization Act of 1985, which allowed the United States to deduct a fee from any award made by the Iran Claims Tribunal to an American claimant. The Claims Court determined that the legislation did not violate the Takings, Due Process or Origination Clauses of the Constitution. After the Federal Circuit reversed the Claims Court's ruling and found section 502 unconstitutional in violation of the Takings Clause, *see* 853 F.2d 904 (1988), the Supreme Court reversed, finding that the assessment was constitutional. In discussing the application of the Takings Clause, the Supreme Court indicated that:

> It is artificial to view deductions of a percentage of a monetary award as physical appropriations of property. Unlike real or personal property, money is fungible... If the deduction in this case were a physical occupation requiring just compensation, so would be any fee for services.... Such a rule would be an extravagant extension of *Loretto* [*v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982)].

493 U.S. at 62 n. 9, 110 S.Ct. 387.

**17.** Were this court obliged to apply a takings analysis to the special assessment, it would, nonetheless, conclude that there has been no taking here. In this regard, the court concurs with the observations expressed in the context of the regulatory takings analysis in *Omaha Public Power District*, 44 Fed.Cl. at 393–94, and its progeny. *See also Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 222–23, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (requirement that employer fund vested benefits of a pension plan not a regulatory taking); *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 641–43, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (rejecting regulatory taking challenge to employer withdrawal liability provisions).

**18.** The role reversals encountered on this jurisdictional point—with plaintiff arguing that this court lacks jurisdiction and defendant arguing that such jurisdiction lies—may be explained in light of the motion for stay filed in this case. Plaintiff argued for the stay based, in part, on its assertion, that this court could not resolve all the issues raised by its complaint. Defendant, in opposing the stay, argued that this court had jurisdiction to resolve those issues.

Consistent with this rule, the Federal Circuit has held that this court ordinarily does not have jurisdiction over claims based on due process violations because, "[a]lthough the Fifth Amendment's due process clause provides that no person shall be deprived of property without due process of law, no language in the clause itself requires the payment of money damages for its violation." *Murray*, 817 F.2d at 1583. *See also Medina Construction, Ltd. v. U.S.*, 43 Fed.Cl. 537, 558 (1999) ("This Court lacks jurisdiction over causes of action alleging violations of the Fifth Amendment principles of due process or equal protection.").

■ However, the courts have reached a different conclusion in so-called illegal exaction cases. Illegal exaction jurisdiction will lie in cases where a "plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1007–1008 (1967). *See also United States v. Testan*, 424 U.S. 392, 400–02, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (referencing Court of Claims jurisdiction over claims "for money improperly exacted or retained"); *New York Life Ins. Co. v. United States*, 118 F.3d 1553, 1556 (Fed.Cir.1997), *cert. denied*, 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed.Cir.1996); *South Puerto Rico Sugar Co. Trading Corp. v. United States*, 167 Ct.Cl. 236, 334 F.2d 622, 626 (1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965). Indeed, "[i]n illegal exaction cases, in contrast to other actions for money damages, jurisdiction exists [to recoup moneys previously paid] even when the [constitutional] provision allegedly violated does not contain compensation mandating language." *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996). *But see Lark v. United States*, 17 Cl.Ct. 567, 569–70 (1989) (rejecting existence of illegal exaction jurisdiction).[19]

■ Moreover, this court has asserted jurisdiction in cases involving exactions that allegedly violated provisions of the Constitution not ordinarily viewed as money-mandating. For example, in *Mallow v. United States*, 161 Ct.Cl. 446, 1963 WL 8503 (1963), this court's predecessor was faced with a claim by a civilian seeking to recover a fine imposed by a courts-martial that had no jurisdiction over him. In these circumstances, the Court of Claims found that the fine was collected in violation of due process and concluded that "it seems that the plaintiff's claim for the recovery of the money that was taken from him by the Government without due process of law may be properly regarded as one 'founded * * * upon the Constitution,' for purposes of 28 U.S.C. § 1491." 161 Ct.Cl. at 454 (alteration in original). More recently, in *Bowman v. United States*, 35 Fed.Cl. at 401, this Court concluded that this court could exercise illegal exaction jurisdiction to consider claims that property had been forfeited in violation of the Double Jeopardy Clause. *See also Doherty v. United States*, 205 Ct.Cl. 34, 500 F.2d 540, 542 (1974) (court had jurisdiction in case involving a claim that application of a forfeiture statute that violated equal protection rendered a taking). Accordingly, these decisions exemplify that this court has jurisdiction to consider whether the special assessment is an illegal exaction violative of the Due Process Clause, despite the fact that that clause does not contain compensation mandating language.

■ Turning to the merits, it is important to note, at the outset, that an economic statute, such as the Energy Policy Act, comes to the court with a presumption of validity. An illustrative case is *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), in which the Supreme Court stated: "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on

---

**19.** Although Judge Tidwell rejected the existence of illegal exaction jurisdiction in *Lark*, he later accepted such jurisdiction in the 1997 case of *Bernaugh v. United States*, 38 Fed.Cl. 538, 543 (1997), *aff'd*, 168 F.3d 1319 (Fed.Cir.1998), noting that "[j]urisdiction exists in illegal exaction cases even when the provisions allegedly violated do not contain money-mandating language."

one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." The Supreme Court has recognized that the strong deference afforded economic legislation applies even when the legislation at issue is applied retroactively. "Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means," the Court stated, "judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). The Court added, "retroactive legislation does have to meet a burden not faced by legislation that has only future effects.... But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.* at 730, 104 S.Ct. 2709. *Accord United States v. Carlton*, 512 U.S. 26, 30–31, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) ("The due process standard to be applied to tax statutes with retroactive effect ... is the same as that generally applicable to retroactive economic legislation...."); *United States v. Sperry*, 493 U.S. at 64, 110 S.Ct. 387, 107 L.Ed.2d 290.

Plaintiff makes two arguments in favor of its claim that the special assessment is an illegal exaction. First, it asserts that the assessment is extremely retroactive, as it imposes a "tax" on government sales of uranium enrichment services that were made as many as 39 years ago. Second, it complains that the assessment is disproportionately imposed. On this latter point, it argues that there is no rational connection between the liability imposed by the special assessments and plaintiff's conduct because the government was in control of the operation of uranium enrichment facilities and those facilities were contaminated before plaintiff began purchasing those services. The court will deal with these arguments in turn.

Regarding the retroactivity of the special assessment, the court must ask the question whether it is rationally related to a legitimate legislative purpose furthered by rational means. While, at first blush, the length of time here might seem problematic, on reflection, the absolute number of years involved is far less relevant than the reasons for the retroactivity and its impact on the plaintiff.[20] In this regard, it is important that the need for decommissioning and decontamination was not fully recognized until near the time the Energy Policy Act was enacted. *See Yankee Atomic*, 112 F.3d at 1576 ("Congress's main purpose was to spread the costs of a problem that it realized only after the contracts had been performed."). Once those costs were recognized, it surely was not inappropriate for the Congress to impose a portion of those costs on the domestic firms who benefited from the enrichment services. Calibrating the special assessment to the number of enriched units received by those utilities certainly was a fair way to quantify those benefits, even though it necessarily entailed some level of retroactivity in terms of calculating how many units had been received by a utility over time. In these circumstances, it cannot be said that the retroactivity of the Act is irrational or that that retroactivity unfairly impacted on the plaintiff. *See Turner Elkhorn*, 428 U.S. at 18, 96 S.Ct. 2882 (noting that it is rational to attempt to impose the costs inherent in a certain type of business activity on "those who have profited from the fruits" of the business in question); *Sperry Corp.*, 493 U.S. at 65, 110 S.Ct. 387 ("It is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the

---

20. *See Robert Morris College v. United States*, 11 Cl.Ct. 546, 553 (1987). Indeed, in various cases, the Supreme Court and others courts have upheld retroactivity much greater in absolute terms than is encountered here. For example, in *Turner Elkhorn*, the black lung law was enacted in 1969 and began imposing liability on employers in 1973. Yet, the court approved providing benefits to miners who left mine work as early as 1923. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 40 n. 4, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)(Powell, J. concurring in part). Similarly, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*, has an unlimited retrospective reach, but has not been invalidated by any court to consider this issue. *See, e.g., United States v. Monsanto Co.*, 858 F.2d 160, 173–74 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).

entire class of persons that Congress rationally believes should bear them.").[21]

In addition, it appears that the liability imposed by the special assessment is neither disproportional nor excessive. The Energy Policy Act imposes liability only on those utilities that benefited from the government's uranium enrichment services. The legislative history of the Act indicates that, notwithstanding the government's earlier use of the facilities for defense purposes, at least two benefits were received by the utilities: (i) the utilities received the government's uranium enrichment services at below the market price; and (ii) by purchasing the government's service, the utilities avoided the cost of building and cleaning up its own plant. *See* Senate Comm. on Energy and Natural Resources, 103d Cong., 2d Sess., *Legislative History of the Energy Policy Act of 1992,* Vol. 6, at 4553–54 (Comm. Print 1994) (Statement of Rep. Philip R. Sharp). *See also Yankee Atomic,* 112 F.3d at 1575–76. Correspondingly, the liability imposed by the Act is reasonably based on each utility's pro rata consumption of the government's uranium enrichment services. Under the Energy Policy Act, the government pays more than 68% of the total decontamination and decommissioning expense, 42 U.S.C. § 2297g–1(a) and (d), while the domestic utilities contribute 32%, subject to both an annual cap, 42 U.S.C. § 2297g–1(c), and an aggregate cap, 42 U.S.C. § 2297g–1(e). Moreover, the Act permits domestic utilities to include the special assessments in "necessary and reasonable" costs, which are fully recoverable in rates. 42 U.S.C. § 2297g–1(g). Given these limitations on the special assessment, the significant contribution of the Federal government and the significant benefits received by the plaintiff in terms of uranium enrichment services, it cannot be said that the burden imposed by the special assessment is disproportionate with the plaintiff's past conduct. See *Omaha Public Power District,* 44 Fed.Cl. at 391–92.

Although the Federal Circuit did not rule on an illegal exaction argument in *Yankee*

*Atomic,* it, nonetheless, observed that the special assessment was not unduly retroactive or disproportionate. In this regard, it stated that "the assessment appears to be very similar to ... a general tax that falls proportionally on all utilities that benefited from the DOE's uranium enrichment services." *Id.* at 1576. It further noted:

> To the extent that the Energy Policy Act is designed to spread the costs of a societal problem, it is not unlike other instances where Congress has enacted legislation to spread societal costs. One such example involves the costs of cleaning up hazardous waste under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq. (1994). The defendants in those lawsuits have frequently challenged the retroactive application of CERCLA as a violation of their due process rights and as an unconstitutional taking. The courts, however, have rejected those arguments. *See id.* at 734 (rejecting due process challenge because "Congress acted in a rational manner in imposing liability for the cost of cleaning up such sites upon those parties who created and profited from the sites and upon the chemical industry as a whole"). Yankee Atomic contends that the CERCLA cases, and others like them, are inapposite because they involve the impact of legislation on private parties and therefore do not implicate the Government's self-interest. We cite the CERCLA cases not for their insight as to Congress' motives in enacting the Energy Policy Act, but rather for their general proposition that the costs of large, unrecognized societal problems are frequently spread among those who benefited from the source of the problem.

*Id.* at 1576 n. 6 (citations omitted). Accordingly, the Federal Circuit opinion in *Yankee Atomic* supports this court's conclusion that the special assessment constitutes a reasonable exercise of the Congress' taxing power, and, as such, does not constitute an illegal exaction.[22]

---

**21.** As the Supreme Court has observed, "whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimen-

sion." *Turner Elkhorn,* 428 U.S. at 19, 96 S.Ct. 2882

**22.** In *Eastern Enterprises,* Justice Kennedy found that the Coal Act was overly retroactive in viola-

### 3. Count III—Was There a Taking of a Contract Right?

In count III of its amended complaint, plaintiff alleges that the imposition of the special assessments constitutes a taking of the fruits of its contractual agreements with the government. Unlike counts I and II, this issue was squarely addressed by the Federal Circuit in *Yankee Atomic v. U.S.*, 112 F.3d 1569. As discussed above, the Federal Circuit held that the special assessments did not constitute a retroactive price increase that abrogated a vested contract right, but instead constituted a sovereign act designed to spread the costs associated with the decontamination and decommissioning over all domestic utilities that used the government's uranium enrichment services. *Id.* at 1580–81. Plaintiff, however, claims that its contracts are significantly different from those at issue in *Yankee Atomic* and that they set the maximum amount of liability it could incur related to uranium enrichment services.[23]

Specifically, plaintiff claims that its 1984 Utility Services Contract with the government differs from contract at issue in *Yankee Atomic.* The pricing provision of this contract provided, in pertinent part, that:

> The charges to be paid to DOE for enrichment services provided to the Customer hereunder will be determined in accordance with the established DOE pricing policy for such services, provided that the unit charge for enrichment services under this contract shall not exceed a ceiling charge of $135.00 per separative work unit through September 30, 1985. After that date, the ceiling charge is subject to adjustment to reflect changes in DOE's costs, including changes in electrical rates and the purchasing power of the U.S. Dollar.

*See* Contract No. DE–SCO5–84UE07511, July 5, 1984 Utility Services Contract, Article IV (Attached at Tab 1 of Complaint filed April 9, 1997). Contrary to plaintiff's claim, however, this pricing provision does not differ significantly from the pricing provision in Yankee Atomic's contracts, which similarly incorporated DOE's pricing policy and established a ceiling charge. *See Yankee Atomic,* 112 F.3d at 1572, 1579.

Plaintiff also notes that it entered into a Supplemental Agreement of Settlement with the government under which all liability was extinguished for purchases of enrichment services made under its pre–1984 contracts. Plaintiff claims that this settlement agreement was not at issue in *Yankee Atomic.* The settlement agreement terminated plaintiff's existing contracts, concluded defendant's obligations arising under the existing contracts, and allowed plaintiff to enter the 1984 Utility Service Contract. The preamble to this agreement indicated that "the Customer and the Government desire to terminate the contracts at no cost to either party in order to enter into a new Utility Services form of uranium enrichment service contract covering the enrichment needs of the facilities designated in said contracts." The actu-

---

tion of the Due Process Clause because Eastern left the coal business before the industry bargaining agreements included a commitment to the funding of lifetime health benefits for retirees. *Eastern,* 524 U.S. at 549, 118 S.Ct. 2131. Eastern could not have contemplated liability for such benefits, and thus there was no correlation between Eastern's conduct and its liability under the Act. In other words, imposing liability on an entity which played no role in promising such benefits was irrational and arbitrary. Justice Kennedy distinguished other Supreme Court cases such as *Turner Elkhorn* and *Gray,* which upheld legislation imposing liability on former employers based on past employment relationships, by stating that such statutes "were remedial, designed to impose an 'actual, measurable cost of [the employer's] business' which the employer had been able to avoid in the past." *Id.* at 549–50, 118 S.Ct. 2131 (citations omitted)(altera-

tion in original). In the instant case, the special assessment under the Energy Policy Act is also remedial and seeks to impose the costs of "a societal problem"—the clean up of uranium enrichment facilities—on those utilities which benefited from the use of uranium enrichment services provided by those facilities. Imposition of a portion of the liability for clean up on the utilities which benefited from the contaminated facilities is a rational means of addressing the problem.

**23.** This court does not have to go outside the pleadings to determine whether the provisions of plaintiff's contracts are materially different from the contracts at issue in *Yankee Atomic* because plaintiff's contracts are attached to its original complaint, filed April 9, 1997.

al agreement which followed contained only two paragraphs, to wit:

1. The contracts identified above are hereby terminated in their entirety.

2. The Customer hereby unconditionally waives any claim against the Government by reason of the termination of the contracts and releases it from any and all obligations arising under the contracts by reason of their termination; and the Government agrees that all obligations arising under the contracts or by reason of their termination shall be deemed to be concluded.

*See* Supplemental Agreement of Settlement, July 5, 1984 (Attached at Tab 2 of Complaint filed April 9, 1997). As can be seen, neither of these clauses addressed or precluded the future assessment of clean-up costs, let alone doing so in the required unmistakable terms. *See Omaha Public Power District,* 44 Fed.Cl. at 388–89 (holding that a similar settlement agreement did not satisfy the unmistakability requirement). Moreover, as the Federal Circuit emphasized in *Yankee Atomic,* the special assessment in the Energy Policy Act did not constitute a modification of the prior contracts, but rather represented simply an exercise of the government's taxing power. *See Yankee Atomic,* 112 F.3d at 1575–77.

Accordingly, the analysis in *Yankee Atomic* is fully applicable to plaintiff's 1984 Utility Services Contract and Supplemental Agreement of Settlement. Neither contract "expressly states that [plaintiff] will be immune from any future assessments made by the Government upon the industry as a whole." *Yankee Atomic,* 112 F.3d at 1579.

Further, neither the fixed price terms of plaintiff's Utility Services Contract nor the termination language in the settlement agreement "constitute[s] an unmistakable promise on behalf of the Government that it will not impose a general assessment upon all utility companies that benefited from the DOE's uranium enrichment services." *Id.* at 1580. Accordingly, count III of plaintiff's amended complaint must be dismissed under the doctrine of *stare decisis,* as resolved by the Federal Circuit's decision in *Yankee Atomic.*[24]

## IV. Conclusion

For the foregoing reasons, the court DENIES plaintiff's motion to stay these proceedings, GRANTS defendant's motion to dismiss, and directs the entry of judgment accordingly.

---

24. Plaintiff further claims that defendant made oral statements which constituted an unmistakable promise that plaintiff would be immune from the general assessment. This claim lacks validity. The unmistakability doctrine is a special rule of contract interpretation that focuses on the express words of the applicable contract. *See Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 618–19 (D.C.Cir.1992). Oral statements or other statements not contained in the contract are irrelevant to the issue whether the contract contains an unmistakable promise exempting the contracting party from a subsequent sovereign act of the government. *See Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) ("[W]e have declined in the context of commercial contracts to find that a sovereign forever waives the

right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in the contract") (citation omitted). *See also Transohio Savings Bank,* 967 F.2d at 618 ("[O]ne who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that the contract confers such a right in unmistakable terms.")(quoting *Western Fuels–Utah, Inc., v. Lujan,* 895 F.2d 780, 789 (D.C.Cir.1990), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 24 (1990), *and cert. denied,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990)); *Statesman Sav. Holding Corp., v. United States,* 26 Cl.Ct. 904, 919 (1992) (same), *aff'd sub nom. Winstar Corp. v. United States,* 64 F.3d 1531 (Fed.Cir. 1995), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).